AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### District of Columbia

FILED IN UNITED STATES DISTRICT COURT, DISTRICT OF UTAH
JUL 07 2017
D. MARK JONES, CLERK
BY _____ DEPUTY CLERK

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No: 1:17-mj-453 |
| | ) | Assigned To: Magistrate Judge Deborah A. Robinson |
| | ) | Date Assigned: 6/29/2017 |
| Jeffrey Kahn | ) | Description: Complaint an Arrest Warrant |
| | ) | |

*Defendant(s)*

2:17mj348 BCW

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **5-24, 6-25, 7-10, 7-30, 8-1 of 2013** in the county of **n/a** in the **n/a** District of **Columbia**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1001 | Making a False Statement |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

U.S. District and Bankruptcy Courts for the District of Columbia
A TRUE COPY
ANGELA D. CAESAR, Clerk
By _____ Deputy Clerk 6/29/17

_____
Complainant's signature

Christopher U. Schott, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: 06/29/2017

City and state: Washington, DC

_____
Judge's signature

Judge Deborah A. Robinson
Printed name and title

## STATEMENT OF FACTS IN SUPPORT OF CRIMINAL COMPLAINT

I, Christopher Sulhoff, being duly sworn, depose and state as follows:

Preliminary Information

1. I am a Special Agent with the United States Office of Personnel Management (OPM), Office of the Inspector General (OIG), duly appointed according to law and acting as such. I have been employed as a Special Agent with OPM-OIG since February 2008, and currently am assigned to Special Investigations/Internal Affairs at OPM-OIG, headquartered in Washington, D.C. Prior to OPM-OIG, I was employed as a Special Agent with the United States Air Force Office of Special Investigations (AFOSI) for 2.5 years. As a Special Agent, I have participated in the successful prosecution and investigation of complex matters involving violations of federal criminal statutes relating to fraud, public corruption, employee misconduct, retirement fraud, health care fraud, and false statements. I received formal law enforcement training at the Federal Law Enforcement Training Center in Glynco, Georgia, and completed the Criminal Investigator Training Program (CITP) which provided training in the techniques, concepts, and methodologies of conducting a criminal investigation, executing search and arrest warrants, conducting surveillance, and court testimony. I was awarded a Master's Degree in Human Relations from the University of Oklahoma.

2. This Affidavit is being submitted for the limited purpose of establishing probable cause to obtain a criminal complaint and arrest warrant. Thus, I have not set forth each and every fact learned during the course of the investigation.

3. The information set forth in this Affidavit is based on my personal knowledge, information provided to me during the course of this investigation, and my review of records, documents, and other evidence obtained during the course of this investigation.

1

4. This Affidavit is being submitted in support of the application for a criminal complaint for JEFFREY SCOTT KAHN (KAHN). The facts set forth in this Affidavit demonstrate that there is probable cause to believe that this individual violated Title 18, United States Code, Section 1001 (Making a False Statement).

## Subject Information

5. KAHN was born on February 14, 1967. His last known address is 97 E. Windlass Road, Saratoga Springs, Utah 84045-6537, located in Utah County. He is currently unemployed.

## Probable Cause

6. At all times material to this Affidavit, KAHN was employed by KeyPoint Government Solutions (KeyPoint) as an investigator under contract to conduct background investigations on behalf of OPM, an agency within the Executive Branch of the federal government, headquartered in Washington, D.C.

7. As background, OPM's National Background Investigations Bureau (NBIB), known as Federal Investigative Services prior to October 1, 2016, was responsible for conducting background investigations for numerous federal agencies and their contractors. OPM-NBIB had an investigator workforce comprised of federal agents employed by OPM-NBIB and investigators employed by various companies, such as KeyPoint, under contract with OPM-NBIB to conduct background investigations. OPM-NBIB conducted background investigations of individuals who were either employed by or seeking employment with federal agencies or government contractors. The purpose of the background investigations was to determine suitability for positions involving public trust, having access to classified information, or impacting national security, or for receiving or retaining security clearances.

8. In conducting these background investigations, contract investigators conducted interviews of individuals who had information about the person who was the subject of the background investigation. In addition, contract investigators sought out, obtained, and reviewed documentary evidence, such as employment records, to verify and corroborate information provided by either the subject of the background investigation or by persons/witnesses interviewed during the investigation. After conducting interviews and obtaining documentary evidence, contract investigators prepared a Report of Investigation (ROI), containing the results of the interviews and records reviews, and electronically submitted the ROI to OPM in Washington, D.C. OPM then provided a copy of the investigative file to the requesting agency and maintained a copy in its records system.

9. The ROI containing the results of the interviews and records reviews conducted during a background investigation was utilized and relied upon by the agency requesting the background investigation to determine whether the subject of the investigation was suitable for a position involving public trust, having access to classified information, or impacting national security, or for receiving or retaining security clearance.

10. On or about May 24, 2013, in the District of Columbia and elsewhere, KAHN, in a matter within the jurisdiction of the Executive Branch of the government of the United States, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, in that in a ROI of the background investigation of C.C., KAHN represented that he had interviewed D.B. about C.C., when, in truth and in fact, KAHN had not interviewed D.B. about C.C.

11. On or about May 24, 2013, KAHN electronically submitted to OPM in Washington, D.C., his ROI on the background investigation of C.C., which contained the aforementioned false

representations. These false representations were material, as they influenced the government's decisions and activities with respect to C.C.

12. On or about June 25, 2013, in the District of Columbia and elsewhere, KAHN, in a matter within the jurisdiction of the Executive Branch of the government of the United States, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation, in that in a ROI of the background investigation of B.C., KAHN represented that he had interviewed P.M. about B.C., when, in truth and in fact, KAHN had not interviewed P.M. about B.C.

13. On or about June 25, 2013, KAHN electronically submitted to OPM in Washington, D.C., his ROI on the background investigation of B.C., which contained the aforementioned false representations. These false representations were material, as they influenced the government's decisions and activities with respect to B.C.

14. Companies under contract with OPM-NBIB were required to maintain a quality control staff and a quality review process, which could include re-contact of sources via telephone. Companies under contract with OPM-NBIB were also required to notify OPM-NBIB when the quality review process resulted in a finding of suspected wrongdoing by an investigator working for the company. In addition, OPM-NBIB on a monthly basis identified random sources gleaned from ROIs and mailed out re-contact letters on each of their federal and contract background investigators. The re-contact letters requested feedback about an investigator's conduct, interview questions, and professionalism. The feedback from the re-contact letters returned to OPM-NBIB was provided to the federal supervisory staff or the contract investigator's employer for further review and assessment.

15. On or about July 16, 2013, P.M. was re-contacted telephonically by a KeyPoint investigator and stated during this telephonic re-contact that she was not interviewed by KAHN regarding B.C. This was contrary to the information provided by KAHN in his ROI regarding the investigation of B.C.

16. On August 12, 2013, P.M. was interviewed in person by an OPM-NBIB investigator and stated during this interview that she was never interviewed by KAHN regarding B.C.

17. In or about August 2013, OPM-NBIB Integrity Assurance (IA) received a re-contact letter returned by D.B., a reported source in KAHN's ROI for the background investigation of C.C. D.B. annotated on the re-contact letter "no interview" in reference to a reported interview of D.B. by defendant KAHN for the background investigation of C.C. On August 16, 2013, D.B. was telephonically contacted by OPM-NBIB-IA and stated during this telephone contact that he was never interviewed, by phone or in person, by KAHN or any other investigator at any time regarding C.C.

18. Due to the concerns raised by the statements of D.B. and P.M., a Targeted Review of cases completed by defendant KAHN was initiated by OPM-NBIB-IA investigators on August 13, 2013. The Targeted Review covered the cases completed by KAHN from April 1, 2013, to August 13, 2013. As a result of the Targeted Review, four additional falsified items were discovered: (i) N.J., who was reported by KAHN as a personal source for the background investigation of R.D., annotated his returned re-contact letter by stating, "I WAS NEVER INTERVIEWED"; (ii) J.R., who was reported by KAHN as a personal source for the background investigation of N.R., annotated his returned re-contact letter by stating, "I received this form in the mail but was never contacted by anyone"; (iii) S.H., who was reported by KAHN as a personal source for the background investigation of A.W., whose wife apparently annotated his returned

5

re-contact letter by stating, "[S.H.] was not contacted he is currently serving overseas in Korea. Thanks his wife"; and (iv) H.H., who was reported by KAHN as a personal source for the background investigation of J.J., annotated his returned re-contact letter by stating, "NO INTERVIEW." Due to these findings, OPM-NBIB-IA directed the suspension of KAHN from the OPM contract on August 20, 2013, and KAHN was subsequently removed from the OPM contract on September 9, 2013.

19. On or about July 10, 2013, KAHN electronically submitted to OPM in Washington, D.C., his ROI regarding the background investigation of J.M., in which KAHN reported that he had interviewed B.M. about J.M. on July 3, 2013, at Dugway Proving Grounds, in Dugway, Utah. On July 1, 2015, OPM-OIG and OPM-NBIB-IA investigators interviewed B.M. regarding the background investigation of J.M. and specific statements attributed to B.M. by KAHN in his ROI. In the July 1, 2015 interview, B.M. stated that he was in Texas on leave between July 1, 2013, and July 11, 2013, and he provided the agents with a printout of his timekeeping records which corroborated his leave status during that time. B.M. further stated that he was never interviewed regarding J.M. during that time period and that, if KAHN had contacted B.M., he would have scheduled the interview at Dugway Proving Grounds on a date when he was not on leave, rather than do the three-day-long drive between Texas and Utah while on leave.

20. On or about July 30, 2013, KAHN electronically submitted to OPM in Washington, D.C., his ROI regarding the background investigation of R.D., in which KAHN reported that he had interviewed N.B. about R.D. On June 29, 2015, OPM-OIG and OPM-NBIB-IA investigators interviewed N.B. regarding the background investigation of R.D. and specific statements attributed to N.B. by KAHN in his ROI. In the June 29, 2015 interview, N.B. stated, among other things, that he would never have told an investigator that he met R.D. at Utah Valley University

(UVU) in January 2010, as reported by KAHN, because N.B. never attended UVU and did not meet R.D. in January 2010. N.B. stated that he met R.D. at Brigham Young University (BYU) in the fall of 2010. N.B. further stated that he has no knowledge of R.D. receiving an Associate's degree from UVU in April 2010 or being a Teaching Assistant and Study Coordinator at UVU, contrary to statements reported by KAHN in his ROI.

21. On or about August 1, 2013, KAHN electronically submitted to OPM in Washington, D.C., his ROI regarding the background investigation of A.M., in which KAHN reported that he had interviewed M.K. about A.M. On June 29, 2015, OPM-OIG and OPM-NBIB-IA investigators interviewed M.K. regarding the background investigation of A.M. and specific statements attributed to M.K. by KAHN in his ROI. In the June 29, 2015 interview, M.K. stated, among other things, that he would never have told an investigator that he sees A.M. a couple times a month for the purpose of A.M. obtaining food stamps and unemployment benefits, as reported by KAHN. M.K. stated that his position has nothing to do with unemployment or unemployment benefits and that he has never met any of his Food Stamps customers in person. M.K. further stated that he has never worked at the address reported by KAHN in his ROI. Moreover, M.K. stated that he had never heard of, had never seen in person, and does not know A.M., so he would not have recommended A.M. for a security clearance as reported by KAHN in his ROI.

22. On or about June 30, 2015, OPM-OIG and OPM-NBIB-IA investigators located KAHN, and he participated in a voluntary interview at his residence. KAHN stated that he was "stunned" by the allegation that he ever falsified any of his investigative work while employed by KeyPoint. KAHN further stated that his supervisor at KeyPoint had spoken with him when he mixed up case notes from two different background investigations and reported the information for one subject of investigation into the other subject of investigation's ROI. KAHN explained that at the time of

his termination he was working on correcting his practices and being more organized with his notes. KAHN repeatedly denied falsifying any of his ROIs or ever reporting testimony for a personal source when he did not speak to or interview the reported individual.

## Conclusion

23. Based on the facts set forth above, I respectfully submit that there is probable cause to believe that JEFFREY SCOTT KAHN violated Title 18, United States Code, Section 1001 (Making a False Statement). I request that a criminal complaint be issued for this individual.

The statements above are true and accurate to the best of my knowledge and belief.

                                                Christopher Sulhoff
                                                Special Agent
                                                U.S. Office of Personnel Management
                                                Office of the Inspector General

Sworn and subscribed to this \_\_\_\_ day of June, 2017.

                                                United States Magistrate Judge